Filed 10/16/14  P. v. Landers CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066485 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1104451) |
| JEFFREY SCOTT LANDERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Christian F. Thierbach, Judge.  Affirmed as modified.

Torres & Torres and Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jeffrey Scott Landers of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found that Landers used a deadly weapon in the commission of the crime (§ 12022, subd. (b)(1)).  Landers admitted five prison priors (§ 667.5, subd. (b)), one prior, which qualified as a serious felony prior (§ 667, subd. (a)(1)), and a strike (§ 667, subds. (b)-(i)).

Landers was sentenced to 50 years to life for the murder conviction with a strike prior.  That term was consecutive to a nine-year determinate term.

Landers appeals contending the trial court erred in denying his motion for self-representation on the day of trial; that the court erred in admission of a hearsay statement and that he is entitled to one additional day of custody credit.  We will find no error in denying Landers's late motion for self-representation and find the evidentiary error in admitting hearsay evidence to be harmless on this record.  The People correctly concede that Landers is entitled to one additional day of custody credit and we will order the judgment modified accordingly.  In all other respects we will affirm the judgment.

Landers does not challenge the sufficiency of the evidence to support his conviction or the weapons allegation.  The only claimed evidentiary error involves a hearsay statement that the People concede was improperly admitted, but argue the error was harmless.  Therefore we will set forth only a brief summary of the facts, which we will adapt from the respondent's brief.

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

STATEMENT OF FACTS

Clara Bibby lived in Riverside with her sons Mark and Randy and a daughter. Landers was her grandson and lived one street over with his girlfriend. Mark lived in Clara's garage in the backyard area of the property.

Mark was friends with Moses Duron. Because Duron had nowhere else to live, Mark let Duron stay with him in the garage. Mark instructed Duron not to let Landers, who frequently came to visit the family, use drugs in the garage. At some point in the days before August 12, 2011, Landers came into Mark's garage wanting to use heroin. Duron stopped Landers and explained that Mark did not want him using drugs in the garage.

During this same time period, Mark suffered an abscessed tooth. Because of the infection, Mark's cheek became swollen. Seeing the swollen cheek, Landers became suspicious that Duron had hit Mark. He also suspected that Duron was forcing Mark to sell drugs. Landers asked his uncle whether his suspicions were true. Mark told Landers that Duron was not doing anything of the sort and that he was merely suffering a tooth infection.

Landers did not accept this and continued to maintain that Duron was physically abusive toward Mark and was forcing Mark to sell drugs. Consequently, Landers decided he needed to take matters into his own hands to protect his uncle. In the late morning of August 12, 2011, he went to his grandmother's house. Inside, his grandmother and uncle Randy were watching television. At various points, Landers asked Randy for a knife and hammer. Randy refused to give these to Landers. A little

3

later, Randy heard a scraping sound in the back yard.  When he went to investigate, he saw Landers scraping a piece of metal back and forth on the concrete as though he were trying to sharpen it.  Thinking nothing of it, Randy returned to watch television with his mother.

In the early afternoon, Landers entered Mark's garage.  Duron was watching television and Mark was drifting in and out of sleep after taking some pain medication for his tooth.  Landers asked Duron whether he could have a cigarette.  Duron invited Landers to make one.  Shortly after Landers rolled himself a cigarette, he took out his sharpened shank and stabbed Duron in the upper chest.  Duron exclaimed, "He just stabbed me.  He just stabbed me."  This prompted Mark to roll over to see what was going on.  He saw Duron standing with his hands over his chest and blood gushing through his fingers.  He then watched Duron collapse to the floor.  Mark asked Landers, "What did you do?  What did you do?"  Landers just stood there and stared at Mark blankly.

Mark ran to the house to call for an ambulance and to get his brother Randy for help.  Landers tried to assert to his uncles that a black man had come into the garage, confronted Duron, stabbed him, and ran away.  Landers then fled.

Duron died from the stab wound to his upper chest.  The wound was five inches deep and had punctured the upper lobe of Duron's left lung.  The pathologist found that one liter of blood had accumulated in the lung.

In a subsequent interview with police, Landers first asserted his story that a black man had come into the garage and stabbed Duron.  However, he later confessed and

4

explained that he believed Duron had been abusing Mark and had been forcing Mark to sell drugs. Landers felt obliged to protect his family and had been planning the killing for days. He explained how he broke an L-bracket for a shelf and sharpened the metal piece to make his shank. After the murder, Landers got rid of the shank by tossing it into a bush. He also changed his clothes and hid the shorts he had been wearing. Landers took police to recover the shank and his shorts.

DISCUSSION

I

*DENIAL OF SELF-REPRESENTATION*

After some in limine motions were heard on the day of trial, Landers brought a motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to replace trial counsel. When that motion was denied Landers said he would "go pro per." (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).) The court found the request untimely, not sincere and would lead to delay. Landers contends the trial court erred in denying his motion and therefore the judgment must be reversed. We find the request was untimely and that the trial court could reasonably conclude the request was equivocal arising from frustration at having the *Marsden* motion denied. The court could also have reasonably concluded that notwithstanding Landers's statement he could proceed, delay would be inevitable because Landers's ability to proceed depended on his receipt of discovery he had not yet seen and had no way of knowing when he would become prepared.

5

A. Legal Principles

Where a defendant makes a timely request for self-representation, and makes a knowing and valid waiver of the right to counsel, the Sixth Amendment requires the court to grant the motion. (*Faretta, supra*, 422 U.S. at pp. 819, 836.) Failure to grant a properly made *Faretta* motion is structural error that requires reversal of the subsequent judgment of conviction. The court must grant the motion where the defendant is mentally competent and makes a knowing and intelligent waiver of the right to counsel; the request is unequivocal and timely. (*People v. Welch* (1999) 20 Cal.4th 701, 729; *People v. Windham* (1977) 19 Cal.3d 121, 127-128.)

Trial courts can deny an untimely *Faretta* motion where there would be disruption of the trial process, or where unreasonable delay will occur. Where a request is made in trial or at the start of the trial, the court must exercise its discretion to determine if there will be delay and if so whether it would be unreasonable. (*People v. Mayfield* (1997) 14 Cal.4th 668, 809.)

The trial court must also determine if the motion for self-representation is unequivocal, or whether it simply arises out of frustration, or a purpose to delay or obstruct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1087; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001-1002.)

On appeal we examine the entire record to determine whether a *Faretta* motion was unequivocal or untimely and, in the last analysis, whether the court abused its discretion even if the request was untimely. (*People v. Marshall* (1997) 15 Cal.4th 1, 24; *People v. Dent* (2003) 30 Cal.4th 213, 218.)

B. Analysis

The trial process had begun in this case by the time Landers made his *Faretta* motion. In limine motions had been heard and jury selection was about to begin. After the trial court denied a defense motion to introduce evidence of Lander's uncle Mark's extensive drug use, Landers made a motion to replace trial counsel. The trial court promptly held a closed hearing pursuant to *Marsden, supra,* 2 Cal.3d 118, to allow Landers to state reasons for his request. At that hearing Landers offered three reasons for changing counsel. The first was that counsel had not given him all of the discovery so he could go through it with a fine tooth comb and search for relevant materials to present to counsel. The second was that counsel had not visited him often enough. The third was that he wanted the evidence regarding his uncle's drug use to be admitted.[2] At that point the court explained they had just had a hearing on the admissibility of such evidence and his attorney had advocated for its admission. The court asked how such advocacy was a source of conflict. Landers responded: "On another--I need to go pro per is what it is."

Thereafter the court found the request untimely, that it was not made in good faith and would cause delay in the trial.

Landers responded: "A delay actually--if I had the discovery and I went pro per right now, I would be right on time." The trial court again denied the request, Landers objected, and asked his attorney to object. He said, in part, ". . . somebody needs to

---

[2] Landers does not challenge the trial court's decision to deny the *Marsden* motion.

object to him that I am--I don't know how exactly that works, but once I get into the law library I will know, write San Quentin, the law office, I will get everything I need, dude."

Landers argues his past-the-last minute request did not raise any issue of delay, because he said he would be ready. We do not believe the record supports such interpretation. First, Landers's complaint to the court was that he needed discovery to go through it with a "fine tooth comb" to search for possible information. He had not seen the discovery at that point. We find it entirely unreasonable to argue Landers could have been ready to proceed with jury selection. An experienced trial judge could easily conclude Landers did not know when he would be ready because he had no idea of what he was going to do with the unknown material. His comments that followed about not knowing what he should do but would find out when he wrote the San Quentin law office, and had access to the law library, clearly demonstrates Landers had no idea what he wanted or needed to do at that point. It simply defies logic to argue the trial judge should have assumed all would proceed in any sort of timely fashion.

Landers also argues the request should have been treated as unequivocal. But we must review the trial court's decision in light of the record. Landers wanted a new lawyer, not self-representation. He was determined that evidence the court just excluded should have been admitted. Notably when the illogic of his position was pointed out to him he simply said "On another--I need to go pro per is what it is." A reasonable trial court could easily understand that in the context of the discussion, the sudden announcement was simply frustration with his circumstance or just another way to secure his request to replace counsel. The self-representation request, in context appears

8

equivocal, and since the request was plainly untimely, the court was well within its discretion to deny it. (*People v. Windham, supra*, 19 Cal.3d at p. 128.)

II

*ADMISSION OF HEARSAY EVIDENCE*

During the trial, the court permitted Landers's uncle, Mark, to testify about statements made to him by the victim, Duron. Mark testified that Duron told him that Duron had told Landers he could not do drugs in the garage. Allegedly, Duron told Landers that Mark had told Landers that Mark had forbidden such activity. Landers timely objected on hearsay grounds. Landers contends the error was prejudicial.

The People concede the court erred in permitting the hearsay evidence, and we agree. The question, however, is whether the error was prejudicial.

Ordinarily the erroneous admission of hearsay evidence is evaluated under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under that standard an error is harmless unless there is a reasonable likelihood that a different result would have occurred without the admission of such evidence. (*People v. Reed* (1996) 13 Cal.4th 217, 230-231.) We are satisfied that on this record there is no reasonable likelihood of a different result taking place without the challenged evidence.

While the prosecution offered the evidence to support a claim of animus on Landers's part as against Duron, such evidence was not remotely prejudicial.

Landers admitted his dislike for Duron. He virtually confessed to the planning of the murder and the reasons for it. There is also evidence that on the day of the murder,

9

Landers went to the house and tried to get a hammer and a knife. When he was refused those weapons, Landers took a metal bracket and sharpened it. He made what he called a "shank," which he then used to stab Duron in the chest, without any provocation.

It is inconceivable that the admission of the challenged hearsay could be prejudicial on the facts of this case. Thus we find the error harmless under *Watson, supra,* 46 Cal.2d 818. Indeed, on this record it is clear the error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is modified to grant Landers one additional day of custody credit. The superior court is directed to amend the abstract of judgment accordingly and to forward the amended abstract to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.